UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MARTY MEYER-GAD, | Civil No. 05-1086 (PJS/RLE) |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| CENTRA CARE HEALTH SYSTEM, d/b/a ST. CLOUD HOSPITAL, | |
| Defendant. | |

Joel A. Fisher, SMITH-FISHER, ATTORNEYS AT LAW, 1401 West Seventy-Sixth Street, Suite 400, Richfield, MN 55423, for plaintiff.

Paul R. Harris, Jacqueline M. Schuh, HUGHES MATHEWS, P.O. Box 548, 110 Sixth Avenue South, Suite 200, St. Cloud, MN 56302, for defendant.

Plaintiff Marty Meyer-Gad ("Meyer-Gad") worked as a chaplain for defendant Centra Care Health System, d/b/a St. Cloud Hospital ("the Hospital"), from January 2003 until the Hospital terminated her employment in October 2004. There is no dispute about why Meyer-Gad was fired: In August 2004, Meyer-Gad informed the Hospital that she had been diagnosed with narcolepsy and that, because of her narcolepsy, she could no longer work past 9:00 p.m. Because the Hospital's chaplains must regularly be on call after 9:00 p.m., the Hospital decided that it could no longer employ Meyer-Gad.

Meyer-Gad brings claims of discrimination under the Americans with Disabilities Act ("ADA"), 42 U.SC. §§ 12101 et seq., and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.080. The Hospital moves for summary judgment on both claims. For the reasons set forth below, the Hospital's motion is granted.

I.  BACKGROUND

The Hospital is a regional, 489-bed acute care inpatient and outpatient facility located in St. Cloud, Minnesota.  As part of its Catholic mission, the Hospital offers a full complement of spiritual care, counseling, and support services to patients, families, Hospital employees, and medical personnel.  Reuter Aff. ¶ 3.  In addition to providing support groups, individual and family counseling, and daily services in its chapel, the Hospital provides 24-hour access to chaplains.  Reuter Aff. ¶ 3.  When Meyer-Gad was hired, the Hospital employed three full-time chaplains (including Meyer-Gad) and four part-time chaplains.  Reuter Aff. ¶ 6.  The Hospital also had four part-time casual chaplains.  Reuter Aff. ¶ 6.  (Counsel for the Hospital explained at oral argument that "casual" workers are generally former employees who occasionally cover shifts when the Hospital is short-staffed.)

The seven chaplains employed by the Hospital worked during the day, but, to ensure that a chaplain would be available at all times, each of the seven chaplains also served on call once each week from 5:00 p.m. to 8:00 a.m.  Reuter Aff. ¶ 6; Meyer-Gad Dep. 46-47.  The on-call chaplain did not have to work the entire time, but rather was expected to respond to emergencies. Meyer-Gad Dep. 46.  The Hospital required the on-call chaplain to be within 15 minutes of the Hospital.  If a chaplain lived more than 15 minutes from the Hospital, he or she was required to stay on site in sleep quarters provided by the Hospital.  Meyer-Gad Dep. 46.  Meyer-Gad understood at the time that she was hired by the Hospital that taking her share of night shifts was a part of her job, even though her written job description did not mention it.  Meyer-Gad Dep. 73.  In addition, the Physical Demand Analysis for the job, which Meyer-Gad signed on

January 9, 2003, stated: "Must be able to endure occasional interruptions of sleep at night." Harris Aff. Ex. 14 at SCH-MMG 00041.

Meyer-Gad began experiencing symptoms of tiredness and an inability to concentrate in late winter and spring of 2003. Meyer-Gad Aff. ¶ 3. She was diagnosed with narcolepsy on July 1, 2003. Meyer-Gad Aff. ¶ 3, Harris Aff. Ex. 19 at 376. Narcolepsy is characterized by the sudden onset of sleep, often at inappropriate times and places, with little or no forewarning sense of sleepiness. *See* Fisher Aff. Ex. B at 2. Meyer-Gad claims that she informed Brad Reuter, her supervisor, of her diagnosis shortly after receiving it. Meyer-Gad Aff. ¶ 7. The Hospital denies this. The parties nevertheless agree that, sometime in 2003, Meyer-Gad asked that she be scheduled for on-call duty only on nights before she had days off, which allowed her to catch up on her sleep. Meyer-Gad Dep. 52. The Hospital agreed, and Meyer-Gad served without incident for the next year.

In July 2004, the Hospital's spiritual-care department was short-staffed, so Reuter asked Meyer-Gad to cover at least two additional nighttime on-call shifts (July 6 and July 26), in addition to her regular shifts on July 9, 16, 21, and 30. Reuter Aff. ¶ 10; Meyer-Gad Dep. 62-63; Meyer-Gad Aff. ¶ 9. This resulted in Meyer-Gad having to be on call without an accompanying day off. Meyer-Gad Aff. ¶ 9. Meyer-Gad informed her doctor of this fact at her next regular appointment. In response, her doctor wrote a note directing that Meyer-Gad should not work past 9:00 p.m. The note did not qualify that directive in any way. Meyer-Gad Dep. 75; Reuter Aff. ¶ 13; Fisher Aff. Ex. A at 7 (Aug. 18, 2004 medical record describing note).

Meyer-Gad gave the note to another Hospital employee (Pat Mueller) and, a few days later, met with Reuter to discuss the situation and give him a copy of the note. Reuter Aff. ¶¶

13-14; Meyer-Gad Aff. ¶¶ 9-11.  Reuter responded by taking Meyer-Gad off the overnight on-call schedule while the Hospital determined what to do.  Reuter Aff. ¶ 14; Meyer-Gad Aff. ¶ 10.  Meyer-Gad alleges that Reuter said the Hospital would solve the problem by hiring an overnight chaplain.  Meyer-Gad Aff. ¶ 11; Meyer-Gad Dep. 72-73.

In September, Fay Chawla, the Hospital's Occupational Health Services coordinator, requested more information from Meyer-Gad's doctor.  Harris Aff. Ex. 26.  Chawla asked, among other things, whether Meyer-Gad could be on call at night if she had access to a quiet sleeping area where she could sleep until needed.  Harris Aff. Ex. 26.  In response, Meyer-Gad's doctor wrote a letter stating that Meyer-Gad's "[n]ormal sleep patterns need to be maintained in order for her treatment plan to be effective.  Interrupted sleep during nighttime hours after 9 p.m. would interfere and compromise her treatment plan already in place."  Harris Aff. Ex. 27.  In other words, the doctor made clear to the Hospital that under no circumstances could Meyer-Gad be on call after 9:00 p.m.  After reviewing this letter, Reuter decided that the Hospital could not accommodate Meyer-Gad on a permanent basis and notified her on October 8, 2004 that her employment would be terminated.  Reuter Aff. ¶¶ 15-16.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the litigation under the governing substantive law.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could . . . return a verdict for [the non-movant]." *Baucom v. Holiday Cos.*, 428 F.3d 764, 766 (8th Cir. 2005).

In considering a motion for summary judgment, a court must resolve factual disputes in favor of the nonmoving party.  *See Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir. 1987).  But this rule does a nonmoving party little good unless she first *creates* a factual dispute.  Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

To avoid summary judgment, the nonmovant must present enough facts "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Evidence is not "sufficient" unless a reasonable jury could return a verdict for the nonmovant.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment must be granted.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

### B.  Plaintiff's Claims

To state a claim under the ADA, Meyer-Gad must show that (1) she is disabled; (2) she is qualified to perform the essential functions of the job, either with or without reasonable accommodation; and (3) she has suffered adverse employment action because of her disability. *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 948 (8th Cir. 1999).  Generally, the same

standards apply to claims under both the ADA and the MHRA, *see Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 711 n.5 (8th Cir. 2003), although the Eighth Circuit has stated that the MHRA creates a "less stringent" standard for determining whether an individual is disabled, *see Liljedahl v. Ryder Student Transp. Servs., Inc.*, 341 F.3d 836, 841 n.3 (8th Cir. 2003).  Meyer-Gad did not separately address the MHRA in her brief, and both sides agreed at oral argument that there are no differences between the ADA and the MHRA that could affect the outcome of this case.  The Court will therefore treat the two claims as one.

### *1.  Disability*

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more . . . major life activities."  42 U.S.C. § 12102(2).  To be substantially limited in a major life activity, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002); *see also Fenney*, 327 F.3d at 715 (holding that *Toyota*'s analysis applies "no matter the specific class of major life activity.").  Furthermore, "[t]he impairment's impact must . . . be permanent or long term." *Toyota*, 534 U.S. at 198.

Meyer-Gad claims that she is substantially limited in the major life activities of sleeping, thinking, and consciousness.  Assuming that these are "major life activities" for purposes of the ADA, Meyer-Gad has failed to show that she is substantially limited in any one of them.  In her affidavit, Meyer-Gad states that she dropped off to sleep at work dozens of times per day and suffered from nightmares, nighttime wakefulness, memory loss, an inability to learn, and an inability to participate in outside activities.  Meyer-Gad Aff. ¶ 5.  Her deposition testimony,

however, establishes that she managed her condition well during her period of employment at the Hospital. She worked without incident for over a year after she was diagnosed with narcolepsy. Although Meyer-Gad alleges in her affidavit that she fell asleep multiple times at work, there is nothing in the record indicating that she had difficulty completing her work or otherwise meeting the Hospital's expectations. Moreover, her doctors never restricted her non-work activities, including driving. Meyer-Gad Dep. 52, 54. She engaged without incident in a number of strenuous outside activities, including raising and butchering sheep and chickens, Meyer-Gad Dep. 53, volunteering for the Sherburne Wildlife Refuge, Meyer-Gad Dep. 53-54, and volunteering to help build houses for Habitat for Humanity, Meyer-Gad Dep. 53-54.

The only restriction ever placed on any of Meyer-Gad's activities was the directive issued by her doctor in August 2004 — one year after she was diagnosed with narcolepsy — that Meyer-Gad could no longer be on call after 9:00 p.m. Even that restriction was lifted less than a year after it was imposed. Since May 2005, Meyer-Gad has worked as a training coordinator at Wal-Mart. Meyer-Gad Dep. 87. In that position, she works 33 to 40 hours per week, usually between the hours of noon and midnight. Meyer-Gad Dep. 98. Meyer-Gad's current doctor has placed no restrictions on her work or outside activities. Meyer-Gad Dep. 85.

Clearly, Meyer-Gad does not now suffer and has not in the past suffered from an impairment that, on a "permanent or long term" basis, "prevents or severely restricts [her] from doing activities that are of central importance to most people's daily lives." *Toyota*, 534 U.S. at 198. There is no evidence that Meyer-Gad's thinking, sleeping, or consciousness was affected "severely" or "permanently." As noted, nine months after the Hospital fired her, Meyer-Gad took a job that requires her not merely to be on call past 9:00 p.m., but regularly to work past

9:00 p.m. *Cf. Fjellestad*, 188 F.3d at 949 ("Significantly, Fjellestad has been unable to obtain employment following her termination."). She has apparently had no difficulty performing that job, and performing that job has apparently caused her no difficulty outside of work. Not surprisingly, her counsel conceded at oral argument that she is not currently disabled.

On this record, a reasonable jury could not find that Meyer-Gad is or was "disabled" for purposes of the ADA. For that reason, the Hospital is entitled to summary judgment on her claims.

### 2. Qualified to Perform Essential Functions

Even if Meyer-Gad were "disabled," the Hospital would nevertheless be entitled to summary judgment because Meyer-Gad has failed to show that she was qualified to perform the essential functions of the Hospital's chaplain position, with or without reasonable accommodation. There are two steps in this inquiry: whether being able to serve on call overnight was an "essential function" of the chaplain position, and, if so, whether Meyer-Gad was capable of being on call overnight with or without reasonable accommodation.

#### a. Essential Function

In determining whether a particular function is "essential," courts may consider evidence concerning the following factors: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before the employer began advertising or interviewing for the position; (3) the amount of time on the job spent performing the function; (4) the consequences of not requiring the employee to perform the function; and (5) the current work experience of employees in similar jobs. *See* 29 C.F.R. § 1630.2(n)(3); *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 786 (8th Cir. 1998). "An employer's judgment [regarding what is

an essential function] is highly probative." *Alexander v. The Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003).

In this case, the Court has little difficulty concluding that being available to serve on call at night was an essential function of the Hospital's full-time chaplain position. The Hospital not only treats physical illness and injury, but also provides spiritual care and counseling. The need for the latter is no more predictable than the need for the former. The Hospital must have spiritual care and counseling available 24 hours every day, and it cannot do so unless its chaplains are available at night.

Meyer-Gad points out that her written job description did not refer to overnight work. That is true, but it is also true that Meyer-Gad has admitted that she knew when she assumed the position as full-time chaplain that she would have to take her share of overnight shifts. Meyer-Gad Dep. 73. The Physical Demand Analysis that Meyer-Gad signed when she began her employment indicated that she "[m]ust be able to endure occasional interruptions of sleep at night." Harris Aff. Ex. 14 at SCH-MMG 00041. Moreover, given that each full-time chaplain was required to be on call for at least one 15-hour shift each week, a significant percentage of the overall time of the chaplains was devoted to this function.

At oral argument, Meyer-Gad's counsel did not dispute that providing overnight on-call service was an essential function of the Hospital's spiritual-care *department*. Instead, he argued that the department could have fulfilled this function without requiring each of its three full-time chaplains to be on call each week. This is essentially an argument about whether Meyer-Gad could have been accommodated, and not about whether being available to serve on call was an

essential function of her position. Thus, the Court concludes that being available to serve on call at night was an essential function of the full-time chaplain position.

*b. Reasonable Accommodation*

Meyer-Gad does not contend that she was capable of performing this essential function of her position without reasonable accommodation. She must therefore make a "'facial showing that reasonable accommodation [was] possible.'" *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir. 1995) (quoting *Mason v. Frank*, 32 F.3d 315, 318 (8th Cir. 1994) (discussing burden-shifting under the Rehabilitation Act)). If she does so, the burden will shift to the Hospital to show that it was unable to accommodate her. *Id.* at 1112.

Meyer-Gad has suggested several accommodations that could have been made by the Hospital: (1) the Hospital could have given her a leave of absence; (2) she could have been offered a position as a casual chaplain; (3) she could have split her shift with another employee; or (4) the Hospital could have had someone else assume her overnight shifts — either by making the existing chaplains take more overnight shifts or by hiring a new chaplain to serve on call at night. None of these proposals amounts to a reasonable accommodation.

While a leave of absence may be a reasonable accommodation under "appropriate circumstances," *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 n.3 (8th Cir. 1999) (citing *Hudson v. MCI Telecomm. Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996)), "it is axiomatic that in order for [Meyer-Gad] to show that she could perform the essential functions of her job, she must show that she is at least able to show up for work," *id.* at 1048. Meyer-Gad's doctor told the Hospital that Meyer-Gad could not work after 9:00 p.m., and he told the Hospital that it was "unknown" whether or when Meyer-Gad would once again be able to work at night. Harris

-10-

Aff. Ex. 27.  The Hospital was "not required to wait indefinitely for [Meyer-Gad's] recovery," *Hudson*, 87 F.3d at 1169, and a leave of absence was therefore not a reasonable accommodation under the circumstances.

Meyer-Gad also contends that she could have become a casual employee.  There are two problems with this contention.  First, there is no evidence that "casual employee" is really a position, rather than a name for the practice of keeping a roster of former employees who are willing to pick up shifts on occasion.  Even if it is a position, there is no evidence that there was a vacancy.  *See* 42 U.S.C. § 12111(9) (reasonable accommodation may include "reassignment to a *vacant* position") (emphasis added); *Cravens v. Blue Cross and Blue Shield of Kan. City*, 214 F.3d 1011, 1019 (8th Cir. 2000) ("[T]he disabled employee must be seeking an existing position within the company; the employer is not required to create a new position as an accommodation.").  Second, the sparse evidence in the record concerning casual employees suggests that, like full-time and part-time chaplains, they, too, were often asked to serve on call overnight.  Meyer-Gad Dep. 63.  That would obviously preclude this as an accommodation for Meyer-Gad.

Meyer-Gad also suggests several ways that others could have been required to perform her overnight shifts for her.  For example, she could have split her shift with another employee and "compensated" by taking on additional weekend work; the other chaplains could have been assigned additional overnight shifts; or the Hospital could have hired a chaplain specifically to work overnight.  But the law is clear that employers are not required to reallocate an essential function of a position or hire a new employee to take over that function.  *See Fjellestad*, 188 F.3d at 950; *Moritz*, 147 F.3d at 788.  Moreover, given that the on-call shift lasted from 5:00

p.m. to 8:00 a.m., Meyer-Gad Dep. 46, Meyer-Gad's "splitting" the shift with another employee by working only until 9:00 p.m. would have differed little from requiring the other employee to take her entire shift. As noted, that kind of reallocation of essential functions is not required by the ADA.

Finally, although Meyer-Gad does not specifically contend that giving her a day off after her overnight shift was a reasonable accommodation, a major theme of her brief is that the Hospital "accommodated" her until July 2004 and then "dis-accommodated" her. To be clear: Beginning in early 2003, the Hospital accommodated Meyer-Gad by scheduling her on-call shifts on nights before she had days off. In July 2004, the Hospital asked Meyer-Gad to work a couple of overnight shifts without the accompanying day off. As Meyer-Gad herself acknowledged, this was to address a temporary situation. Too many people were on vacation at once, and Meyer-Gad was asked to take a couple of extra shifts because she was "the only one left." Meyer-Gad Dep. 63, 65. There is no evidence that this "dis-accommodation" was permanent or even that it was likely to arise again. More importantly, though, all of this is irrelevant to Meyer-Gad's present claims. Both Meyer-Gad and her doctor told the Hospital in August 2004 that she could not work after 9:00 p.m. whether or not she got the next day off. It is that restriction that is at issue here.

One final point on accommodation: Meyer-Gad faults the Hospital for failing to take part in the "interactive process" and argues that other reasonable accommodations might have come to light if it had. "[O]nce an employer is notified that an employee is disabled and has requested an accommodation, the employer should engage in an interactive process with the employee to try to find reasonable accommodations for the disability." *Stern v. Univ. of Osteopathic Med.*

*and Health Scis.*, 220 F.3d 906, 909 (8th Cir. 2000). But because Meyer-Gad has neither shown that she is disabled nor that reasonable accommodation was possible, the Hospital had no duty to engage in the interactive process. *See Fjellestad*, 188 F.3d at 952 ("[T]here is no per se liability under the ADA if an employer fails to engage in an interactive process"); *see also Dropinski v. Douglas County*, 298 F.3d 704, 710 (8th Cir. 2002) (where suggested accommodations created an undue burden, any analysis of the interactive process would be "superfluous"); *Ciszewski v. Engineered Polymers Corp.*, 179 F. Supp. 2d 1072, 1091-92 (D. Minn. 2001) (because plaintiffs failed to show that reasonable accommodation was possible, the court did not need to examine whether the employer failed to engage in the interactive process). It is Meyer-Gad's burden to make a facial showing that some reasonable accommodation was possible. The Court cannot deny summary judgment on the basis of speculation that someone might have come up with something if only the Hospital had engaged in the interactive process.[1]

---

[1] Even if the Hospital had a duty to engage in the interactive process, the Hospital seems to have fulfilled that duty in this case. According to Meyer-Gad, the Hospital knew of her impairment for almost the entire period of her employment and accommodated her until July 2004. When Meyer-Gad informed the Hospital in August 2004 that she could no longer work after 9:00 p.m. — even if she had the next day off — Reuter met with her and immediately took her off the night shift. The Hospital then sought further information about the nature and duration of her restriction before deciding that it could not accommodate her. This was not a terribly robust "interactive process" — the Hospital should have met with Meyer-Gad again before firing her — but the Hospital's conduct does not seem to violate the ADA.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that defendant's motion for summary judgment [Docket No. 19] is GRANTED, and plaintiff's claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: October 18, 2006                    s/Patrick J. Schiltz
                                           Patrick J. Schiltz
                                           United States District Judge